FILED
SUPERIOR COURT
OF GUAM

2021 MAR -3 PM 12: 02

CLERK OF COURT
BY: _____

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| EULALIA W. VALDEZ n/k/a<br>EULALIA W. CORNIELLE,<br><br>Plaintiff,<br><br>vs.<br><br>PETERNILO L. VALDEZ,<br><br>Defendant. | DOMESTIC CASE NO. DM0044-13<br><br><br>**DECISION AND ORDER**<br>**(Plaintiff's Motion to Enforce**<br>**Divorce and Property Settlement**<br>**Agreement)** |

## INTRODUCTION

This matter came before the Honorable Dana A. Gutierrez on November 3, November 6, November 9, and December 4, 2020 for Evidentiary Hearings on Plaintiff's Motion to Enforce Divorce and Property Settlement Agreement filed on August 3, 2020.[1] Having duly considered the arguments, testimony and evidence received by the Court and applicable law, the Court now issues the following Decision and Order.

## BACKGROUND

This matter arises out of Plaintiff's Ex Parte Motion for Contempt and Motion to Enforce Divorce and Property Settlement Agreement ("Motion to Enforce") filed on August 3, 2020. In the Motion to Enforce, Plaintiff asserted that Defendant was in breach of the Settlement Agreement signed by the parties on August 8, 2014 for failure to pay the balloon payment on the second mortgage of the parties' Barrigada Heights Property due July 31, 2020. The Motion to Enforce requested that the Court hold Defendant in contempt, order that Defendant immediately transfer his

---

[1] Present at all hearings via Zoom were Plaintiff Eulalia W. Cornielle ("Plaintiff"); Attorney Daron J. Berman representing Plaintiff; Defendant Peternilo L. Valdez ("Defendant"); and Attorney Louie J. Yanza representing Defendant.

ownership interest in the property to Plaintiff, and either: 1) order Defendant to immediately pay the balloon payment in full, or 2) order Defendant to refinance the property, or 3) enter a judgment against Defendant in the amount owed on the second mortgage so that Plaintiff may seek post judgment collection efforts against him after she refinances the property on her own.

On August 6, 2020, Defendant filed an Opposition to the Motion to Enforce ("Opposition"). In the Opposition, Defendant informed the Court that First Hawaiian Bank ("FHB"), the Mortgagee, granted Defendant an extension of the maturity date until October 31, 2020. Defendant requested that the Court deny the Motion to Enforce and grant Defendant attorney's fees claiming that Plaintiff's filing was frivolous. Plaintiff filed a Reply on August 20, 2020 requesting that the Court either enforce the Agreement or alternatively, schedule a hearing soon after the October 31, 2020 maturity date.

At a September 30, 2020 Further Proceedings hearing, Plaintiff withdrew the Motion for Contempt acknowledging that the maturity date was extended by FHB, but requested a hearing on the Motion to Enforce.[2] Due to Plaintiff's withdrawal of the Motion for Contempt, Defendant withdrew his request for attorney's fees.[3] The Court scheduled an Evidentiary Hearing on the Motion for November 3, 2020 and ordered that the parties submit Further Briefing addressing the potential remedies the Court may impose if it finds that Defendant is in breach of the Agreement.

Plaintiff filed a Supplemental Briefing on October 9, 2020. Defendant filed a Response on October 16, 2020. Plaintiff filed a Reply on October 23, 2020. The Court held Evidentiary Hearings on the Motion to Enforce on November 3, November 6, November 9, and December 4, 2020. Upon the close of arguments and the presentation of the evidence, the Court took this matter under advisement.

## FINDINGS OF FACT[4]

By a preponderance of evidence, the Court makes the following findings of fact:

1.      Plaintiff and Defendant were married on January 5, 1995.

2.      Plaintiff and Defendant separated on June 20, 2012.

3.      The Parties were granted a dissolution of the marriage on April 4, 2013.

---

[2] Min. Entry, at 9:12:39 AM (Sept. 30, 2020).
[3] *Id.* at 9:13:45 AM.
[4] Placement of a fact under a particular section herein is not controlling; a finding of fact may state legal conclusions and discussion of the applicable legal principles may state a finding of fact.

4. Before the parties divorced, the parties lived in the Barrigada Heights Property located at 156 Lila Loop, Barrigada Heights, Guam 96913 (the "Property").

5. From approximately July 2012 to September 2012, after the parties separated but before their divorce, Defendant spent $29,278.56 in order to renovate the Property.

6. The April 4, 2013 Final Divorce Decree and accompanying Interlocutory Judgment of Divorce incorporated the original Divorce and Property Settlement Agreement (the "original PSA") entered into by the parties. With regard to the Property, the original PSA states:

> Within one (1) year, both Plaintiff and Defendant agree that the Defendant shall buy out the Plaintiff's interest in the Barrigada Heights property. The Plaintiff shall have the option to choose a licensed appraiser to determine the current market value of the property and the Defendant shall buy out the Plaintiff's interest in the property based upon the current market value less the first and second First Hawaiian Bank mortgage. The Plaintiff shall receive from the Defendant 100% of the equity in the property and Defendant shall pay Plaintiff 50% of that amount up front and the remaining 50% in installments over a period of 5 years. The Defendant shall ensure that the Barrigada Heights property will remain in trust to the parties minor children and shall not be transferred to any other individual without the consent of all three of the parties minor children.

Additionally, under the original PSA, the community debts were allocated such that Defendant was responsible for the first and second mortgages on the Property held by FHB, with approximate balances of $366,449.00 and $124,844.00, respectively.

7. On August 22, 2013, Plaintiff filed a Motion for Contempt and Enforcement of the original PSA asserting that Defendant failed to honor his obligation to buy out Plaintiff's equity interest in the Property. In November 27, 2013 Decision and Order ("D&O") Judge Michael J. Bordallo granted Plaintiff's Motion in part and ordered that Defendant show cause as to why he should not be held in contempt of the Court's April 4, 2013 Interlocutory Judgment of Divorce and the accompanying original PSA.

8. After an Order to Show Cause hearing, Judge Bordallo issued a January 22, 2014 D&O ordering Defendant to provide Plaintiff with a full copy of a property appraisal for the Property, in preparation of the eventual equity turnover as provided in the original PSA.

9. Sometime in May 2014, Defendant attempted to consolidate both FHB mortgages and refinance the Property in accordance with the original PSA, but due to the fact that there was not enough equity in the Property, was unable to do so.

3

10. The original PSA allows for modification if in writing and signed by both parties.

11. On August 8, 2014, the parties drafted and signed a written modification agreement of the original PSA (the "Agreement").

12. The Agreement was signed by both parties and directly addressed the parties' rights and responsibilities concerning the Property, but did not otherwise modify the original PSA.[5]

13. The Agreement states:

> As of August 8, 2014 Eulalia White will have the following with regard to the property located on 156 Lila Loop, Barrigada Heights Guam 96913
>     1. 100% vested interest of the property;
>     2. 100% ownership of the property;
>     3. Servicing responsibilities of the FHB 1st mortgage **Acct #1578558**;
>     4. 100% of the responsibility of maintenance and upkeep of the property;
>     5. 100% of the rent proceeds will be realized by Eulalia White;
>     6. 100% of the taxes and interest paid credits related to owning of the property and the 1st mortgage Acct# 1578558.
>
> As of August 8, 2014 Peternilo Valdez will have the following with regard to the property located on 156 Lila Loop, Barrigada Heights Guam 96913
>     1. Servicing responsibilities of the FHB 2nd mortgage **Acct# 35-032492**;
>     2. Forfeits all vested interest and ownership of the property;
>     3. Forfeits all maintenance and upkeep responsibilities of the property;
>     4. Forfeits authorization to claim any tax credits or interest paid for this property;
>
> This agreement will be valid until one of the listed conditions exists:
>     1. Both Eulalia White and Peternilo Valdez agree to refinance the property and gain sole loan liability for the loans in which they are currently servicing according to this agreement.
>     2. Both the 1st mortgage **Acct #1578558** and the 2nd Mortgage **Acct# 35-032492** are repaid in full by the servicing agents.
>
> In the event that any of these conditions are completed, the property located on 156 Lila Loop, Barrigada Heights Guam 96913 will be owned by Eulalia White if retained or all proceeds will be credited to Eulalia White if the property is sold.
>
> Any and all liability or credits associated with the property located on 156 Lila Loop, Barrigada Heights Guam 96913 prior to August 8, 2014 will be the responsibility of Peternilo Valdez to include mortgage loan payments and interest paid credits.

---

[5] Min. Entry, at 9:56:37 AM (Nov. 3, 2020) (Defense counsel states that the parties do not dispute the authenticity of the Agreement.).

14. The parties have acted in accordance with the Agreement by servicing their respective mortgages since August 8, 2014.

15. At the time the parties executed the Agreement, the FHB second mortgage had a maturity date of July 31, 2020 on which a balloon payment of the entire outstanding principal balance on the loan, would be due.

16. On October 24, 2017, Plaintiff filed a Motion for Contempt and Enforcement arguing that Defendant was in breach of the Agreement for failing to make payments toward the principal balance of the FHB second mortgage. In a March 8, 2018 D&O, Judge Bordallo found that the Agreement was a valid mutually agreed-upon modification of the original PSA. The Court held that Defendant was not in breach of the Agreement because his obligation was only to "pay his Minimum Payment on or before the due date on his periodic statements." The Court further held that "[a]fter the 143 Minimum Payments, Defendant is then required to make a single balloon payment covering the entire balance owed on the mortgage."

17. On February 24, 2020, Plaintiff filed a Motion to Enforce requesting a quitclaim deed from Defendant in order for Plaintiff to refinance the Property, and for Defendant to pay directly to Plaintiff the principal balance owed on the FHB second mortgage; or, alternatively requested that Defendant be ordered to deposit the amount owed on the principal balance into an escrow account in order for Plaintiff to pay the balloon payment by the July 31, 2020 maturity date.

18. Judge *Pro Tempore* Jonathan R. Quan held Evidentiary Hearings on Plaintiff's Motion to Enforce on June 11 and June 17, 2020. In a July 20, 2020 D&O, Judge *Pro Tempore* Quan reaffirmed Judge Bordallo's prior finding that the Agreement was a valid modification of the original PSA. The Court denied Plaintiff's Motion finding that it could not hold Defendant in breach of the Agreement because the loan would not mature until July 31, 2020. The Court noted that "[o]n August 1, 2020, if the balloon payment has not been paid in full, or if the FHB second mortgage has not been refinanced by the parties, then the matter of whether the Defendant is in violation of the Agreement can be decided."

19. On August 3, 2020, FHB granted an extension of the maturity date of the FHB second mortgage until October 31, 2020.

20. As of the date of the Evidentiary Hearings on Plaintiff's present Motion to Enforce, the October 31, 2020 maturity date has passed and Defendant has not paid the outstanding balloon

payment on the FHB second mortgage.

**LEGAL PRINCIPLES AND DISCUSSION**

The matter before the Court is Plaintiff's Motion to Enforce the Agreement.[6] Under Guam law, the Court applies principles of contract interpretation to divorce decrees that incorporate property settlement agreements. *Leon Guerrero v. Moylan*, 2000 Guam 28 ¶ 7-9 (ruling that marital property agreements, even if incorporated into a final divorce decree, are treated as contracts and the law of contracts governs interpretation of the decree's legal force and meaning). Here, the original PSA was incorporated into the Final Divorce Decree and accompanying Interlocutory Judgment of Divorce. Then, as noted above, the parties modified the terms of the original PSA with respect to the Property by entering into the Agreement.

Guam law provides the trial court with jurisdiction to enforce contracts created through execution of a written instrument. *Hemlani v. Hemlani*, 2015 Guam 16 ¶ 19. The Court will apply the principles of contract interpretation to the Agreement as a written modification of the Final Divorce Decree that incorporated the original PSA. In order to establish a breach of contract the plaintiff must prove: 1) the existence of a contract, 2) the plaintiff's performance or excuse for nonperformance, 3) the defendant's breach, and 4) resulting damages to the plaintiff. *See id.*

## I. A Contract Exists.

With regard to the first element Plaintiff must prove, Plaintiff asserts that a valid modification of the original PSA exists between the parties—the Agreement. Mot. to Enforce, at 3 (Aug. 3, 2020). In response, Defendant raised the argument that the Agreement may not be a valid contract because there was no "meeting of the minds." *See, e.g.*, Min. Entry, at 9:56:56 AM (Nov. 3, 2020).[7]

Under Guam law, the "essential elements of a contract include an offer, acceptance, and consideration." *Blas v. Cruz*, 2009 Guam 12 ¶ 18 (citing 18 GCA § 85102) (analyzing whether an enforceable Marital Settlement Agreement existed between the divorced parties). The original PSA provides that: "[a]ll modifications of this Agreement shall be of no effect unless expressed in writing and signed by both parties." Original PSA, at 10 (April 4, 2013). In Judge Bordallo's March 8, 2018 D&O, the Court found that: "[t]he parties mutually agreed to modify the March 26, 2013 Divorce and Property Settlement Agreement." D&O, at 2 (March 8, 2018). Then, in Judge

---

[6] As noted above, Plaintiff withdrew the Motion for Contempt at the September 30, 2020 Further Proceedings hearing.
[7] The Court notes that Defendant did not brief this issue in his pleadings.

*Pro Tempore* Quan's July 20, 2020 D&O, the Court recognized that the original PSA allowed for modifications and treated the Agreement as a valid modification. D&O, at 4-5 (July 20, 2020). Although the two prior Decisions found that the Agreement was a valid modification of the original PSA, and, therefore, an enforceable contract, this Court will review the matter based on the arguments put forth by the parties.

### A. There Was Valid Offer and Acceptance.

The Agreement is in writing, signed by both parties, notarized, and directly addresses an asset originally disposed of through the original PSA. On its face, there appears to be offer and acceptance. As explained below, the Court finds that there was a "meeting of the minds," and alternatively, if there was not a "meeting of the minds" when the parties executed the Agreement, the parties' conduct subsequently ratified the Agreement.

### 1) There Was a Meeting of the Minds.

Central to the elements of "offer" and "acceptance" is the principle that "consent of the parties to a contract must be free, mutual and communicated by each to each other." *Blas*, 2009 Guam 12 ¶ 18 (citing 18 GCA §§ 85301, 85316). However, despite the prerequisite of "mutual assent" to the formation of a contract, "the use of the term 'meeting of the minds' should not lead to a requirement that the subjective mental processes of each party must concur before a contract can result. On the contrary, it is what is expressed by the parties that constitutes the contract which courts enforce." *Fairway Center Corp. v. U.I.P Corp.*, 502 F.2d 1135 (8th Cir. 1974).[8]

The notion that there was no "meeting of the minds" is unavailing because the Court must look objectively to the parties' conduct in order to determine whether a valid contract was formed, and not at a party's "undisclosed intentions." *See Breaks*, 985 F.2d at *4. Here, the parties do not

---

[8] *See Avel Pty., Ltd. v. Breaks*, 985 F.2d 571, 1993 WL 11867 at *4 (9th Cir. 1993) ("A party's undisclosed intention does not determine whether a valid contract has been formed.") (affirming the trial court's jury instruction that the jury must look objectively at the parties' conduct to determine whether there was a "meeting of the minds."); *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011) (describing mutual assent as the point when the contracting parties have a "meeting of the minds" and holding that "mutual assent" must be "based on the objective conduct of the parties."); *Baker v. Elmwood Distributing, Inc.*, 940 F.2d 1013, 1017 (7th Cir. 1991) ("In order for there to be a contract between parties there must be a meeting of the minds or mutual assent as to the terms of the contract; however, it is not necessary that the parties share the same subjective understanding as to the terms of the contract.") (internal citations omitted); *United Paperworkers Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1258 (5th Cir. 1990) ("In determining whether there was a meeting of the minds, the parties' objective, rather than subjective intent governs."); *Navair Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1139 (10th Cir. 2008) (In determining whether there was a "meeting of the minds," "the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract.").

dispute that they both signed the written Agreement which contains definite terms with respect to the parties' obligations regarding the Property, and there is no evidence before the Court that the parties' outward conduct objectively indicated that either party did not intend to enter into and be bound by the Agreement.

Even if Defendant internally had a different understanding of what would happen in the future, the Court cannot consider that understanding when determining whether or not the parties outward conduct constituted "mutual assent," otherwise, a party could always escape a contract's requirements "by simply contending that it did not understand them at the time." *See Tagnetics, Inc. v. Kayser*, 2021 WL 129071 at *7 (6th Cir. 2021). Based on the parties' affirmative conduct of signing the written Agreement and a lack of any evidence showing that the parties' outward conduct indicated a lack of consent to enter into and be bound by the Agreement, the Court finds that there was a "meeting of the minds," and consent of the parties was "free, mutual and communicated by each to each other." *See Blas*, 2009 Guam 12 ¶ 18 (citing 18 GCA §§ 85301, 85316).

### 2) The Parties' Subsequent Conduct Ratified the Contract.

Even if there was no "meeting of the minds," "a contract which is voidable solely for want of due consent, may be **ratified** by a subsequent consent." *Guam United Warehouse Corp. v. DeWitt Transp. Servs. Of Guam*, 2003 Guam 20 ¶ 16-18 (citing 18 GCA § 85324) (emphasis added); *see also Unified Interest v. PacAir Props.*, 2017 Guam 9 ¶ 43 ("Few contracts would be enforceable if the existence of subsequent disputes were taken as evidence that an agreement was never reached.")

The parties do not dispute that they have been acting in accordance with the Agreement since its execution in August 2014. Consequently, the parties conduct—namely the Defendant's servicing of the second mortgage and the Plaintiff's servicing of the first mortgage for over six years—constitutes adequate evidence of "assent and ratification of the contract." *See Guam United Warehouse Corp.*, 2003 Guam 20 ¶ 18. Therefore, even if mutual assent did not exist at the time of the Agreement's execution, the parties' subsequent conduct "ratified" the Agreement. Accordingly, the Court finds that there was a "free, mutual and communicated" offer and acceptance of the Agreement in this case.

### B. There Was Consideration.

"Consideration, in a contract, is the *quid pro quo* that the party to whom the promise is

made, does or agrees to do in exchange for the contract." *See HRC Guam Co. v. Bayview II, LLC.*, 2017 Guam 25 ¶ 85. Where there is a "mutual consideration" made between contracting parties, "in the absence of any evidence to the contrary, we assume that there was a *quid pro quo*, and that the obligation of one contracting party was equal to the value of [what was received]." *Id.*

Under the original PSA, Defendant was required to: 1) buy out the Plaintiff's equity interest in the Property, and 2) pay off the debt on the Property incurred by the first *and* second mortgages held by FHB. By contrast, under the Agreement, Defendant was no longer required to buy out the Plaintiff's equity interest in the Property within one year, nor was he required to service the first mortgage. Rather, Plaintiff gave up the requirement that Defendant buy out her equity interest, and, additionally, Plaintiff took on the obligation to service the first mortgage. Based on the changed obligations of the parties under the Agreement, the Court finds that there was sufficient consideration.

In sum, the Court finds that the essential elements of offer, acceptance, and consideration are present in light of: 1) the signed, written Agreement executed by the parties, 2) the parties conduct by way of acting in accordance with the Agreement since its execution in August 2014, and 3) the changes in obligations under the Agreement compared to the obligations under the original PSA. Accordingly, a valid contract, through modification of the original PSA, exists between the parties.

II. **Plaintiff Has Performed Her Obligations and Defendant Has Breached His Obligations Pursuant to the Plain Meaning of the Agreement.**

The second and third elements that the Plaintiff must prove in order to establish a breach of contract and, therefore enforce the Agreement through court order are the Plaintiff's performance (or excuse for nonperformance) and the Defendant's breach. *See Hemlani*, 2015 Guam 16 ¶ 19. This dispute arises out of Plaintiff's assertion that Defendant is in breach of the Agreement because he has not paid the balloon payment for the second mortgage when it was due pursuant to the loan agreement with FHB. Plaintiff maintains that she will sign any bank document which will allow Defendant to refinance the FHB second mortgage so long as the Property is not used as the collateral. Mot. to Enforce, at 3 (Aug. 3, 2020); Min. Entry, at 3:54:51 PM (Nov. 6, 2020).

In response, Defendant asserts that he has attempted to comply with the Agreement by making efforts to refinance the FHB second mortgage on the Property by using the Property as the collateral for the refinancing. *See* Opposition, at 1-2 (Aug. 6, 2020); Deft.'s Response to Plaintiff's

Supplemental Briefing, at 5 (Oct. 16, 2020). Defendant argues that Plaintiff has "unclean hands" and has "frustrate[d] Defendant's ability to comply with the Agreement" because of her refusal to agree to use the Property as collateral for a refinancing of the FHB second mortgage. Deft.'s Response to Plaintiff's Supplemental Briefing, at 5 (Oct. 16, 2020). Additionally, Defendant attempted to introduce extrinsic evidence such as emails and conversations among the parties in order to show that the parties' intent was that the Agreement be interpreted as *requiring* Plaintiff to 1) agree to refinance, and 2) use the Property as the collateral in the event of a refinancing. *See, e.g.*, Min. Entry at 1:39:00 PM (Dec. 4, 2020); Deft.'s Response to Plaintiff's Supplemental Briefing, at 4 (Oct. 16, 2020).

A. **The Agreement Is Not Capable of Different Interpretations Because the Agreement Is Unambiguous on Its Face.**

Defendant argues that "this case presents a clear example of an agreement that is capable of two different interpretations." Opposition, at 2 (Aug. 6, 2020). Ultimately, Defendant asserts that the Agreement states that "each party agrees to refinance the property." Min. Entry, at 9:38 AM (Nov. 3, 2020); *see* Deft.'s Response to Plaintiff's Supplemental Briefing, at 6 (Oct. 16, 2020). The Court disagrees with Defendant and finds that the Agreement on its face is not capable of two different reasonable interpretations.

The Court cannot look to extrinsic evidence to interpret the parties' intentions with respect to the terms of the Agreement unless the terms of the contract are "ambiguous." *Ramiro v. White*, 2016 Guam 6 ¶ 18-20. A contract is "ambiguous" only when it is "capable of two different reasonable interpretations on its face." *Id.* at ¶ 19. Additionally, "the intent of the parties to a contract is generally, and whenever possible, restricted by the plain meaning of the contract terms." *Id.* (citing *Wasson v. Berg*, 2007 Guam 16 ¶ 10); *see also* 18 G.C.A. § 86107 ("The execution of a contract in writing, whether law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.); 18 G.C.A. § 87105 ("The language of a contract is to govern its interpretation, if the language is clear and explicit[.]").

The Guam Supreme Court has explicitly adopted the "traditional approach" which "requires courts to look to the four corners of the contract, and determine whether, as a matter of law, any ambiguity exists." *Ramiro*, 2016 Guam 6 ¶ 22; *see also Guam United Warehouse Corp.*, 2003

Guam 20 ¶ 15) ("If a written instrument, *on its face,* expresses a contractual obligation, one of the parties should not be permitted to avoid it on the grounds that it was never intended as such.").

Looking at the language within the four corners of the Agreement, the terms are unambiguous and clear. The Agreement clearly lists the parties' rights and responsibilities with regard to the Property, and it states that the Agreement "will be valid until one of the listed conditions exist: 1) Both [parties] agree to refinance the property . . . 2) Both the 1st Mortgage Acct# 1578558 and the 2nd Mortgage Acct# 35-032492 are repaid in full[.]" Defendant's Exhibit A (Nov. 3, 2020). The pleadings and testimony demonstrate that both parties understood that "the property" refers to the Property located at 156 Lila Loop, Barrigada Heights, Guam 96913. *See, e.g.,* Min. Entry, at 2:55:13 PM (Nov. 6, 2020) (Plaintiff testified that "the property" referred to in the Agreement is the Barrigada Heights residence.); Min. Entry, at 2:10:00 PM (Nov. 9, 2020) (Defendant testified that "the property" referred to in the Agreement is the Barrigada Heights residence.). Additionally, the parties and the mortgage accounts are defined in the Agreement.

Lastly, although Defendant made a general statement that the agreement "is capable of two different interpretations," Defendant failed to direct the Court to any specific language or term that Defendant believes is "ambiguous" or not "clear and explicit." *See* Opposition, at 2 (Aug. 6, 2020). In fact, Defendant's proposed "interpretation" is effectively the same as both the plain meaning of the Agreement and Plaintiff's interpretation. When arguing that the Agreement is "capable of two different interpretations," Defendant elaborates stating that "what the parties anticipated when the agreement was signed" is that "Plaintiff would pay for the servicing of the first mortgage while Defendant would pay for servicing of the second mortgage **until both parties agree to refinance both mortgages using the same property or until both mortgages are paid in full.**" Opposition, at 2 (Aug. 6, 2020) (emphasis added). Regardless of any disagreement concerning whether the Property must be used as collateral, Defendant's "interpretation" of the Agreement is that Defendant must pay for servicing of the second mortgage until either 1) both parties agree to refinance, or 2) both mortgages are paid in full. The plain meaning of the Agreement and Plaintiff's understanding of the parties' obligations is consistent with this interpretation, further demonstrating that the Agreement is not capable of two different interpretations.

Thus, in looking at the Agreement on its face, "one simply cannot glean" from the "four corners" of the Agreement, that there is any ambiguity as to its meaning. *See Wasson,* 2007 Guam

11

¶ 21. Because the Agreement is unambiguous, it is not capable of two different reasonable interpretations, and the Court may not look to extrinsic evidence to interpret the parties' intentions with respect to the terms of the Agreement. Based on the finding that the Agreement is unambiguous, the Court will not look beyond the written terms of the contract to ascertain the intention of the parties. *See Scroggs v. Scroggs*, 2014 Guam 2 ¶ 19 (citing *Moylan*, 2000 Guam 28 ¶ 8; 18 GCA § 87104; 18 GCA § 87105).

**B.      Plaintiff Has Performed Because The Agreement Does Not Require Her to Agree to Refinance, and the Agreement Does Not Require That the Property Be Used As Collateral.**

Defendant has indicated that Plaintiff's refusal to agree to refinance and use the Property as collateral is in violation of the terms of the Agreement. *See* Opposition, at 1-2 (Aug. 6, 2020); Deft.'s Response to Plaintiff's Supplemental Briefing, at 5-6 (Oct. 16, 2020). Neither parties disputes that Plaintiff has been performing her obligation to service the first mortgage pursuant to the Agreement. Thus, the issue is whether Plaintiff's refusal to agree to refinance the FHB second mortgage using the Property as the collateral constitutes a violation of the Agreement.

Because the Agreement is unambiguous as explained above, the Court must look to the writing alone to determine the contractual obligations of the Plaintiff. *Scroggs*, 2014 Guam 2 ¶ 19; *Ramiro*, 2016 Guam 6 ¶ 19 ("The intent of the parties to a contract is generally, and whenever possible, restricted by the plain meaning of the contract terms."). The Agreement states in relevant part: "The Agreement will be valid until one of the listed conditions exists: 1. Both [parties] agree to refinance the property[.]" Defendant's Exhibit A (Nov. 3, 2020).

The "plain meaning" of this term is that the Agreement *allows* but does not *require* the parties to agree to refinance the Property. Despite implication to the contrary, Defendant concedes to this meaning when he writes: "the Agreement **permits** refinancing" where it states that the parties "agree to refinance the property," as this section refers to a permissive condition. *See* Deft.'s Response to Plaintiff's Supplemental Briefing, at 5 (Oct. 16, 2020) (emphasis added). Defendant also contradicted his assertion that Plaintiff *must* agree to refinance when Defendant testified that the Agreement **does not say** that the parties must use the Property as the collateral. Min. Entry, at 2:11:50 PM (Nov. 9, 2020). In response to Plaintiff's counsel's question whether the Agreement says that the parties must agree to "refinancing the Property by using the Property as collateral," the Defendant responded, "It doesn't say that."). *See id.*

Moreover, condition one in the Agreement permits both parties to "agree to refinance the property **and gain sole loan liability for the loans in which they are currently servicing**[.]" Defendant's Exhibit A (Nov. 3, 2020) (emphasis added). The "plain meaning" of this language means that if the parties were to agree to refinance, then the refinancing must give each party *sole loan liability* for their respective loans. If Defendant were to refinance the FHB second mortgage using the Property as the collateral, Plaintiff would not be removed from the liability on the second mortgage, as the Property would remain subject to Defendant's loan. If Defendant's loan were to be secured by the Property, the purpose of this condition would be frustrated because the parties would not *gain sole loan liability* for their respective mortgages.

Based on the "plain meaning" of the language in the Agreement, the Court finds that the Agreement *permits* Plaintiff to agree to refinance the Property, but does not require her to do so, nor does it require the parties to use the Property as the collateral for the FHB second mortgage if they were to agree to refinance. Consequently, because the parties do not dispute the fact that Plaintiff has been making the required payments on the first mortgage, the Court finds that Plaintiff has performed her obligation to service the first mortgage pursuant to the Agreement, and her refusal to agree to refinance or use the Property as collateral does not constitute a violation of the terms of the Agreement.

### C. Defendant Has Breached His Obligation to Service the FHB Second Mortgage.

Plaintiff argues that Defendant's failure to pay the balloon payment by its extended maturity date of October 31, 2020 constitutes a breach of the Agreement. *See* Mot. to Enforce, at 2-3 (Aug. 3, 2020); Min. Entry, at 2:26:00 PM (Dec. 4, 2020). In response, Defendant argues that "nowhere in the Agreement calls for a deadline to transfer Defendant's interest" in the Property to Plaintiff, and Plaintiff "fails to direct the court's attention to language that required the Defendant to pay off the mortgage now." Deft.'s Response to Plaintiff's Supplemental Briefing, at 3, 5 (Oct. 16, 2020). Defendant's argument fails for two reasons.

First, the Court has already found that the Agreement requires Defendant to pay the balloon payment on its maturity date pursuant to the second mortgage loan agreement with FHB. In the March 8, 2018 D&O issued by the Judge Bordallo, the Court found that "[a]fter the 143 Minimum Payments, Defendant is then required to make a single balloon payment covering the entire balance

13

owed on the mortgage." D&O, at 3 (March 8, 2018). Based on the Decision, Defendant was at least put on notice that this was his obligation.

Second, the "plain meaning" of the Agreement demonstrates that Defendant has breached his obligations. In determining whether Defendant has breached, the Court must look to the written terms of the contract. *See Moylan*, 2000 Guam 28 ¶ 8. The plain language of the Agreement clearly states that Defendant is responsible for "servicing" the FHB second mortgage. *See Ramiro*, 2016 Guam 6 ¶ 19. Additionally, as noted above, Defendant concedes that his understanding of the Agreement is that he must pay for the servicing of the FHB second mortgage until either 1) both parties agree to refinance, or 2) both mortgages are paid in full. Opposition, at 2 (Aug. 6, 2020). Furthermore, Defendant admits that neither of these two conditions have occurred: both parties have not agreed, nor have both mortgages been paid. Deft.'s Response to Plaintiff's Supplemental Briefing, at 3 (Oct. 16, 2020). Therefore, Defendant is responsible for servicing the FHB second mortgage.

Importantly, Defendant does not dispute that he has not paid the balloon payment due on the FHB second mortgage, but rather argues that the Agreement does not include "language that require[s] the Defendant to pay off the mortgage now." Deft.'s Response to Plaintiff's Supplemental Briefing, at 3 (Oct. 16, 2020). Thus, the issue of Defendant's breach turns on whether the "plain meaning" of the term "servicing" in the Agreement obligated Defendant to pay the balloon payment for the FHB second mortgage on its maturity date. *See Ramiro*, 2016 Guam 6 ¶ 19.

In *Wasson*, the Supreme Court held that words in a contract "should generally be accorded their ordinary meanings, unless specifically stated otherwise in the contract." 2007 Guam 16 ¶ 26. Based on this principle, the *Wasson* Court found that a plain reading of the parties' contract demonstrated that the term "install" was "unambiguous" on its face, and the Court used a definition from the Encarta World English Dictionary in order to identify the "plain meaning" of the word. 2007 Guam 16 ¶ 24, n. 7.

Here, this Court will follow the Supreme Court's approach and turn to a commonly used dictionary in order to identify the plain meaning of the term "servicing." "Loan servicing" is defined by Black's Law Dictionary as the "borrower's obligation of timely loan interest and **principal** periodic payments based on the loan agreement's terms." *Loan Servicing, Black's Law*

*Dictionary* (2d Ed. 1910) (emphasis added).

Accordingly, the Court finds that "servicing" as used in the Agreement designated *to the Defendant* the obligation to pay off the loan pursuant to the terms required by the FHB loan agreement, which includes paying the monthly minimum interest payments and the *principal* balance on the loan when due.[9] As noted above, the Court already found that the Agreement does not require that Defendant use the Property as collateral to refinance the second mortgage. Therefore, based on the Court's March 8, 2018 D&O and the plain meaning of the term "servicing" in the Agreement, the Court finds that Defendant's failure to pay the balloon payment on its maturity date constitutes a breach of his obligation to "service" the FHB second mortgage.

**III.        Plaintiff Is Entitled to Relief As a Result of Defendant's Breach.**

The last element the Plaintiff must prove in order to establish a breach of contract and therefore enforce the Agreement is the resulting damages. *Hemlani*, 2015 Guam 16 ¶ 19. As a result of Defendant's failure to pay the balloon payment on the FHB second mortgage by its maturity date, Plaintiff is requesting the following relief: that the Court order the Defendant to transfer his ownership interest in the Property to Plaintiff via quitclaim deed, and that the Court either: 1) enter a judgment or order against the Defendant for the principal amount owed on the FHB second mortgage, including an equal portion of the closing costs associated with the refinancing of the loans, in favor of the Plaintiff in exchange for the Plaintiff refinancing both mortgages under her name alone, or alternatively, 2) order Defendant to deposit the balloon payment amount into an escrow account so that the balloon payment can be paid by Plaintiff. Plaintiff's Supplemental Briefing, at 3 (Oct. 9, 2020).

As of the December 4, 2020 hearing, Defendant did not dispute that he has not paid the balloon payment due on the FHB second mortgage. Instead, Defendant argues that Plaintiff "seeks remedies that are not in the Agreement," and, "the only reasonable and appropriate remedy is refinancing." Deft.'s Response to Plaintiff's Supplemental Briefing, at 2, 4 (Oct. 16, 2020). Additionally, Defendant claims that deeding the Property to Plaintiff now was not contemplated by the Parties because either the agreement of both parties to refinance or both mortgages being paid in full is a "condition subsequent" to Plaintiff realizing sole ownership of the Property. Deft.'s

---

[9] The parties do not dispute that the second mortgage matured on October 31, 2020 pursuant to the second mortgage loan agreement with FHB and subsequent extension given.

15

Response to Plaintiff's Supplemental Briefing, at 2, 4 (Oct. 16, 2020); Min. Entry, at 1:18:46 PM (Dec. 4, 2020). The Court finds Defendant's arguments unavailing.

### A. The Agreement Does Not Contain Conditions Subsequent That Must Be Met Before Plaintiff Is Entitled to Sole Ownership of the Property.

Defendant argues that the "Agreement is in force until either both Plaintiff and Defendant agree to refinance the property; **or** both the 1st Mortgage and 2nd Mortgages are paid in full. If either condition is completed, then the Barrigada house will be owned by Plaintiff. Neither has happened." Deft.'s Response to Plaintiff's Supplemental Briefing, at 3 (Oct. 16, 2020). Defendant asserts that because the conditions have not occurred, Plaintiff is not entitled to full ownership of the Property.

Defendant confuses a "condition subsequent" with a "condition precedent." A condition precedent is "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (2d) of Contracts § 224 (1981). In looking at the substance of Defendant's argument, Defendant is actually arguing that either 1) both parties must agree to refinance, or 2) both mortgages must be paid off *before* Defendant must transfer title of the Property to Plaintiff. In other words, Defendant asserts that one of the conditions must occur before Defendant's obligation to perform a transfer of title to Plaintiff becomes due, meaning they are conditions *precedent* to Defendant's performance of transferring title.

This argument must fail because "a person cannot take advantage of his own act or omission to escape liability; if he *prevents or makes impossible* the performance or happening of a condition precedent, the condition is excused." *Nystrom v. First Nat. Bank of Fresno*, 146 Cal. Rptr. 711, 766 (Cal. App. 1978); *see Sananap v. Cyfred, Ltd.*, 2008 Guam 19 ¶ 66 ("The first party to commit an uncured material breach should not be able to claim a right to suspend performance resulting from a later material breach[.]"). Furthermore, "a materially breaching party cannot claim benefit from the contract." *Sananap*, 2008 Guam 19 ¶ 66.

Defendant has failed to pay off the second mortgage constituting a breach of the Agreement. His breach means that the second condition is impossible—both mortgages cannot be paid in full because Defendant failed to pay the second mortgage. Therefore, even if Plaintiff were to fully perform her obligation under the Agreement until the first mortgage is paid off, the second

condition still would not be met because of Defendant's breach.

Additionally, as the Court held above, the Agreement does *not require* Plaintiff to agree to refinance, but rather permits her to do so. Therefore, Plaintiff's refusal to refinance is not a breach that has made the first condition impossible—it is still possible, if both parties wish to agree. By contrast, the Agreement *does require* that Defendant pay off the second mortgage, and his refusal to do so makes the second condition impossible to achieve.

Because Defendant materially breached, he cannot now rely on the argument that Plaintiff is not entitled full ownership in the Property until the conditions are met. Defendant's argument that he may delay transfer of ownership to Plaintiff until the conditions are met (either both parties agree to refinance or both mortgages are paid off) is unavailing because Defendant was the first to materially breach his obligation and, as a result, he cannot claim a benefit from the terms of the contract.

**B.      The Court Must Fashion An Equitable Remedy When One Is Not Specified in the Contract.**

The parties do not appear to be in dispute that FHB will hold (if they have not already) the FHB second mortgage in default. Defendant further testified that Plaintiff is also named on the loan agreement with FHB, so Plaintiff would be implicated in the event of default. Min. Entry, at 2:11:50 PM (Dec. 4, 2020).

The Court recognizes that the Agreement does not provide for remedies in the event of a breach. However, "a contract may be enforceable even if it does not specify a remedy for a breach" because "common law provides a range of remedies for breach." *Hickcox-Huffman v. U.S. Airways*, 855 F.3d 1057, 1064-65 (9th Cir. 2017); *see U.S. v. Winstar*, 518 U.S. 839, 885 (1996) ("even where the parties did not specify a remedy in the contract . . . damages are always the default remedy for breach of contract."); *Butlet v. Enter. Integration Corp.*, 459 F. Supp. 3d 78, 93 (D.D.C. May 6, 2020) ("A contract need not specify a remedy for breach at the outset. **If the terms of the contract are clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy, then it is enforceable**.") (emphasis added).

Under Guam law, "as a general rule, compensation is a relief or remedy . . . for the violation of private rights, and the means of securing their observance; and specific . . . relief may be given in no other cases than those specified in this Title or in Title 7 of the Guam Code

Annotated." 20 GCA § 1101. "Specific performance of an obligation may be compelled" except as otherwise prohibited under Guam law. 20 GCA § 3220. The instances wherein specific performance is prohibited under Guam law are not applicable to the facts of this case, therefore, specific performance of Defendant's obligation to transfer title in the Property to Plaintiff may be compelled in accordance with what the Court deems equitable. *See* 9 GCA § 3225; 9 GCA § 3226; 9 GCA § 3227.[10]

1)    **The Agreement Provides That Plaintiff Is Entitled to Full Ownership of the Property, and Defendant Has Forfeited His Interest Paid and Ownership Interest.**

Again, the Court must turn to the language of the Agreement in order to "ascertain" the "intention of the parties." *Scroggs*, 2014 Guam 2 ¶ 19. The Agreement states: "As of August 8, 2014 Eulalia White will have . . . 1. 100% vested interest of the property; 2. 100% ownership of the property . . . As of August 8, 2014, Peternilo Valdez will have the following with regard to the property . . . 1. Servicing responsibilities of the FHB 2nd mortgage . . . 2. Forfeits all vested interest and ownership of the property . . . 4. Forfeits authorization to claim any . . . interest paid for this property[.]" Defendant's Exhibit A (Nov. 3, 2020).

Based on the plain reading of this language, the Court finds that the intent of the parties was to give Plaintiff ownership of the Property *as of August 8, 2014*. Additionally, the plain language shows that Defendant must pay the amount due on the FHB second mortgage. Lastly, the plain language demonstrates that Defendant forfeited any "vested interest and ownership" and any claim to "interest paid" for the Property as of August 8, 2014, meaning that Defendant cannot claim a

---

[10] *See also Vaccarella v. Vacarella*, 49 S.W.2d 307, 315 (Tenn. Ct. App. 2001) ("Judges in domestic relation cases have broad discretion to fashion an appropriate remedy considering all of the circumstances of an individual case."); *Sims v. Sims*, 2008 WL 5274855 at *4 (Ky. Unpub. 2008) ("Trial courts have very broad discretion to fashion a fair and appropriate remedy which is specific to the particular action since no two dissolution actions are alike."); *Rezai v. Porada*, 2018 WL 6767849 at *16-17 (Ill. App. Unpub. 2018) ("We find that because plaintiffs were not limited to seeking specific performance, the circuit court had the discretion to fashion an appropriate remedy based on the particular circumstances of this case, and did not abuse that discretion in awarding plaintiffs damages instead of ordering specific performance.") (where the Defendant argued the circuit court should have ordered specific performance of Defendant's promise to transfer his interest in the Property and that the court erred by finding that Defendant's unpaid taxes on the Property rendered specific performance impractical); *Nelson v. Nelson*, 135 N.E.3d 166 at *8-9 (Ind. App. Unpub. 2019) (where the Indiana Court of Appeals upheld the trial court's order that the husband sell his property and hold the proceeds in trust to determine the wife's damages as a result of husband's breach of the Final Divorce Decree and the trial court's award of attorney's fees to the wife); *Gross v. Gross*, 1996 WL 33349165 at *3 (Mich. App. 1996) ("Divorce actions are equitable in nature, and when acting in divorce cases, circuit courts have the authority to make any order to enforce their judgments . . . The lower court was bound to use its equitable powers to fashion a remedy according to the specific facts as was necessary to accord complete equity and conclude the controversy.")

right to equity in the Property based on the interest payments he has made on the second mortgage. Therefore, in order to provide the Plaintiff with equitable relief, Defendant must transfer title in the Property to Plaintiff and pay the amount due on the FHB second mortgage plus an equal portion of the costs incurred by Plaintiff when refinancing the mortgage in order to remedy Defendant's breach.

### 2)   The Agreement Does Allocate Credits to the Defendant for the Amount Paid Toward Improvements on the Property Prior to August 8, 2014.

The Agreement states "[a]ny and all . . . **credits** associated with the property . . . prior to August 8, 2014 will be the responsibility of Peternilo Valdez[.]" Defendant's Exhibit A (Nov. 3, 2020) (emphasis added). As found above, from approximately July 2012 to September 2012, after the parties separated but before their divorce, Defendant spent $29,278.56[11] of his separate money in order to renovate the Property to prepare it for leasing. Based on the "plain meaning" of the Agreement, this Court finds that the Agreement provides for Defendant to receive credit for the money he spent toward improvements on the Property.

As a result the Court finds that in addition to Defendant's transfer of his interest in the Property to Plaintiff, the appropriate equitable relief for Defendant's breach is a judgment in favor of Plaintiff for the amount owed on the FHB second mortgage, including an equal portion of the closing costs associated with Plaintiff's refinancing of the loans in her name alone, less the amount that Defendant spent on renovations prior to August 8, 2014.

### IV.   Plaintiff is Entitled to Reasonable Attorney's Fees.

Plaintiff requests that the Court award Plaintiff reasonable attorney's fees should she prevail on the Motion to Enforce. Mot. to Enforce, at 5 (Aug. 5, 2020). Guam follows the "American Rule" for attorney's fees. *Fleming v. Quigley*, 2003 Guam 4 ¶ 7. Under the American Rule, parties bear their own litigation expenses, including attorney's fees. *Id.* However, the American Rule recognizes an exception to this principle if the attorney's fees are authorized by contract. *Id.*

The original PSA signed by the parties states that "should either party be required to seek enforcement or compliance with this Agreement through the Superior Court of Guam, in any form of action, the prevailing party is entitled to recover from the other party all reasonable attorney's

---

[11] At the hearing on December 4, 2020, the parties stipulated that Defendant spent twenty nine thousand two hundred seventy eight dollars and fifty six cents ($29,278.56) on renovations for the Property. Min. Entry, at 1:07:32 PM (Dec. 4, 2020); *see also* Defendant's Exhibit E (Dec. 4, 2020).

fees and costs then incurred." Original PSA, at 9 ¶ 20. Although the modification Agreement signed in 2014 does not include a provision addressing attorney's fees, a modification to a contract does not replace the pre-existing obligations "unless it be shown that the parties intended and agreed to extinguish the original contract." *Pangelinan v. Gutierrez*, 2014 Guam 16 ¶ 24, *rev'd on other grounds*.

In *Pangelinan*, the Court found that even where the parties showed a substantial change in the contract's terms under the subsequent modification, there was "no showing that the parties intended the subsequent modifications to extinguish and replace the already existing contract." *Id.* at ¶ 24. Similarly, there is no evidence that the parties in the case at bar intended that the Agreement "extinguish and replace" the remaining, unchanged terms in the original PSA. Because Plaintiff was required to seek enforcement of the Agreement through the Superior Court of Guam, and the Plaintiff prevailed in this case, the Court finds that an award of reasonable attorney's fees and costs in favor of Plaintiff is appropriate.

## CONCLUSION

Based upon a preponderance of the evidence and based on the foregoing reasoning, the Court **GRANTS** Plaintiff's Motion to Enforce Divorce and Property Settlement Agreement. Accordingly, the Court hereby **ORDERS** that:

1)    Defendant shall cooperate in executing any and all documentation necessary, including but not limited to executing any deeds or other instruments required by any financial institution, in order to transfer title in the Property to Plaintiff and allow her to refinance the FHB first and second mortgages;

2)    Defendant shall pay Plaintiff for the amount due on the FHB second mortgage, including an equal portion of the closing costs associated with Plaintiff's refinancing of the mortgages in her name alone, less the amount of $29,278.56 as a credit toward Defendant;

3)    Within thirty (30) days of this Order, Plaintiff shall provide a report to the Court addressing her refinancing of the mortgages on the Property, to include a report of closing costs to refinance, and the outstanding balance of the FHB second mortgage;

4)    Plaintiff is entitled to recover from Defendant the reasonable attorney's fees and costs incurred as a result of this Motion to Enforce Divorce and Property Settlement Agreement. Within thirty (30) days of this Order, Plaintiff shall provide a statement to the Court accounting for

the attorney's fees and costs incurred. Defendant shall have fourteen (14) days from the filing of Plaintiff's attorney's fees statement in order to file any response as to the reasonableness of such fees and costs; and

5)    The parties shall execute any and all other or further instruments necessary or convenient in order to carry out the provisions in this Order.

**SO ORDERED** this 3rd day of March, 2021.

HONORABLE DANA A. GUTIERREZ
Judge, Superior Court of Guam

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:

Date:_____ Time:_____

Deputy Clerk, Superior Court of Guam